Fuchsberg, J. (dissenting).
Though I agree generally with the result urged by my fellow dissenting Judges, I would offer certain specific suggestions that I think the courts should take into account in assigning counsel in these cases.
One of the appellants is an indigent plaintiff wife in a divorce case, the other an indigent defendant wife in a similar action. They were originally represented by Cornell Legal Aid, but in each action a motion was made before Special Term of the Supreme Court to permit Legal Aid to withdraw as counsel, because of a conflict of interest, to allow appellants to proceed as poor persons under CPLR 1102, and to assign counsel to them at the expense of Tompkins County. The record does not specify the nature of the conflict of interest on which the motion was based, but at oral argument it was developed that Cornell Legal Aid also represented parties who were either correspondents or major witnesses in the actions.
The court granted the motions, and ordered the county to provide legal representation within 30 days, specifying that, if it did not do so, appellants could themselves choose counsel, whose fees would be fixed by the court and paid by the county. The court did not make any findings either as to whether counsel was necessary to provide appellants with meaningful access to the court, or as to whether counsel could be provided in any other way.
The county then appealed the order insofar as it directed payment of counsel. The Appellate Division reversed, holding that the lower court lacked the power to direct public payment for the services of counsel in a civil case, except where there is a constitutional right to counsel. It ruled there was no such constitutional right in matrimonial actions.
I agree with the Appellate Division that Special Term’s order must be reversed, but, since I share my fellow dissenters’ view that appellants may indeed have a constitutional right to counsel, the appropriate disposition is to remand the action to the Supreme Court for further findings as to the need for counsel in this action, and, if counsel is necessary, for further consideration about the method for providing it.
I
It appears to me that the problems raised by this case can *447 best be analyzed by distinguishing between the separate questions of whether indigent parties to a divorce action have a right to be furnished with counsel, and how, if such a right exists, it is to be implemented. As part of the analysis of the second question, it is appropriate to consider whether the right can ever be implemented by directing a county to pay for counsel, and whether such a direction was proper in this case.
II
Since the decision in Gideon v Wainwright (372 US 335), holding that a person has a constitutional right to be supplied with counsel when his or her liberty is threatened in a felony proceeding, the law has been confronted with Gideon’s implications for proceedings denominated as "civil” in which fundamental interests no less important than freedom from incarceration are threatened. These varieties of civil litigation include several areas in which personal liberty is very much at stake: habeas corpus actions, child custody cases, parole revocation proceedings, juvenile hearings, civil commitment suits, and other matters in which "certain nominally civil causes can result in a severe deprivation of liberty”. (Note, The Right to Counsel in Civil Litigation, 66 Col L Rev 1322, 1332.)
Boddie v Connecticut (401 US 371) confirmed the importance of the personal interests at stake in divorce proceedings and held that the opportunity to be heard in such cases is an essential safeguard to the personal liberty of the parties. The State, through its courts, lawfully monopolizes the right to dissolve marriages; without such dissolution of the marriage contract, citizens are locked into untenable marriages permanently, and "more fundamentally [are confronted with] the prohibition against remarriage” (p 376). New York recognizes that where marriage relationships are threatened by serious incompatibility (Domestic Relations Law, § 170, subd [6]),[1] or, even more seriously, by such factors as adultery or cruel and inhuman treatment (Domestic Relations Law, § 170, subds [1], [4]), the courts should be available to release the parties from *448 matrimony and to resolve ancillary disputes involving property, support, and custody.
In Boddie, only the question of filing fees was at issue. The court held that, because indigents have a constitutional right to access to the courts for divorce litigation, States must allow them to file such cases without payment of the fees. But the principle of Boddie goes far beyond filing fees; the case stands for the proposition that people may not be denied the right to obtain a divorce solely on the ground of indigency.
That all real economic barriers to court access in divorce cases must fall is made clear by our decision in Deason v Deason (32 NY2d 93), holding that the printing cost of service by publication could not stand as an obstacle to an indigent seeking a divorce. Though Deason involved payment of expenses to a third party rather than to the court system itself, "The effect of indigency is * * * the same * * -* denial of access to the courts” (p 95).
Is denial of the right to counsel a real barrier to access to court for litigants, either in civil cases generally or in divorce actions in particular? Unfortunately, in our complex society, it is. As Mr. Justice Sutherland said in Powell v Alabama, "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law.”[2] (287 US 45, 68-69.) Generally speaking, "the inability of the unskilled litigant to prepare his pleadings, conduct adequate investigation, familiarize himself with the rules of evidence, research decisional law, or persuasively argue his case in court seems no less debilitating in most civil litigation [than in criminal cases]”. (Note, The Right to Counsel in Civil Litigation, 66 Col L Rev 1322, 1331.) "Laymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries”. (Railroad Trainmen v Virginia Bar, 377 US 1, 7.)
With this in mind, courts have recently been applying the reasoning of Gideon v Wainwright (372 US 335, supra), to some "civil” matters where important issues of liberty or property were at stake. For instance, in Matter of Ella B. (30 *449 NY2d 352), our court ruled that an indigent parent, threatened in a neglect proceeding with termination of the right to custody of a minor child, had the right to be provided with counsel. Similarly, it was held in People ex rel. Rogers v Stanley (17 NY2d 256), that indigent mental patients have a constitutional right to be given counsel to challenge by habeas corpus their commitment to an institution. And in People ex rel. Menechino v Warden (27 NY2d 376), we determined that the due process clause of the State Constitution requires that counsel be given to an indigent parolee at the final hearing on revocation of his parole, a principle recently affirmed in People ex rel. Calloway v Skinner (33 NY2d 23).
Our New York lower courts too have been sympathetic to the need for counsel to implement the right to be heard effectively. They have held that indigents have a right to assigned counsel in matrimonial litigation. (See, e.g., Jacox v Jacox, 43 AD2d 716; Matter of Bartlett v Kitchin, 76 Misc 2d 1087; and in other actions, Hotel Martha Washington Mgt. Co. v Swinick, 66 Misc 2d 833 [due process right to appointed counsel for indigent who shows merit in summary eviction]; Matter of Linda G. v Theodore G., 74 Misc 2d 516 [support proceeding]; Matter of White v Green, 70 Misc 2d 28 [neglect]; Amendola v Jackson, 2 CCH Pov L Rep, par 17,476 [contempt proceeding for violation of support order].)[3]
Nor does the need or should the right of all citizens to counsel stop here. As Learned Hand put it, "If we are to keep our democracy, there must be one commandment: Thou shalt not ration justice.”[4] So I most respectfully take issue with my fellow dissenters when they suggest a clear distinction between the right of indigents to be represented by counsel in litigation seeking the dissolution of a marriage as opposed to other types of civil litigation. Rather on that matter I stand with the majority when it says "the problem is not peculiar to *450 matrimonial litigation. The horizon does not stop at matrimonial or any other species of private litigation”.
However, it is one thing to state that the denial of counsel is an obstruction to access to courts in the civil litigation of matters of consequence to people generally, and another to apply that principle to divorce actions in particular. Therefore, a closer examination of divorce litigation is necessary to determine whether lack of counsel is a genuine obstacle in such cases.
In the State of New York, many divorce cases are extremely simple. In a very large percentage of divorces involving indigents, there exists no legal dispute whatsoever; the court performs an essentially ministerial function either because the parties have executed and complied with a one-year separation agreement under subdivision (6) of section 170 of the Domestic Relations Law, or because the parties have agreed to a dissolution on grounds of cruelty, and one party appears in court to give summary unchallenged testimony of abuse. In such divorces, it is probable that many uncounseled litigants would be able to process the litigation by themselves, perhaps with the assistance of Bar-approved manuals for the layman or of trained paraprofessionals, or with the aid of court clerks who, aware of the shortage of legal services for the poor, are usually extremely helpful in explaining procedures to unrepresented parties, and should be encouraged to assist them.[5]
In addition, a substantial number of contested divorces involve no disagreement about the decision to end the marriage, but only difficulty in resolving issues of custody or support. Even where custody and support are initially contested, the Supreme Court may refer those ancillary services to the Family Court, whose mediation services may resolve the dispute without requiring counsel. (Family Ct. Act §§ 464, 652, 424-425.)
But indigents are also parties to divorces where the dissolu *451 tion of the marriage itself is contested, or where issues of custody and support are not capable of informal mediation. In such cases, if the spouses ultimately disagree about any of these three issues—ending the marriage, support of a spouse, or custody and child support—in my view, the assistance of counsel is essential, because lay persons are generally incapable of effectively meeting their legal burdens where such issues are disputed. For example, a party seeking, against a spouse’s will, to terminate a marriage, must first decide whether it is preferable to obtain a divorce or an annulment. If the former, the party must select the best ground for obtaining the divorce (e.g., abandonment, mental cruelty, adultery, or other grounds; see Domestic Relations Law, § 170). It is also necessary to marshal evidence, and abide by technical requirements of proof. (See, e.g., Domestic Relations Law, § 211.) Also, as in any civil case, a command of the rules of procedure and skill in presenting facts are essential. (See Domestic Relations Law, § 232.) The party opposing divorce must have a similar command of the legal intricacies. For example, where adultery is charged, the defendant may need technical assistance to identify and offer the relevant defenses of insanity, condonation, recrimination, procurement, collusion or Statute of Limitations. (Domestic Relations Law, § 171.)
Also, if there is a dispute over support, pretrial investigative tools may be essential for discovering resources. Refusing counsel to an indigent party can, therefore, jeopardize that party’s right to obtain support from a solvent spouse. And, if custody is disputed, the need for counsel is most apparent; children’s futures will depend upon the outcome of the case, necessitating factual inquiries beyond the competence of the lay person. Frequently, expert witnesses must be examined. The Judge must often depend on counsel for the effective investigation, organization and presentation of the facts since the law’s only guide is the vaguely worded standard of the "best interests of the child”.
As this court said in Matter of Ella B. (30 NY2d 352, 356), "[a] parent’s concern for the liberty of the child, as well as for his care and control, involves too fundamental an interest and right * * * to be relinquished * * * without the opportunity for a hearing, with assigned counsel if the parent lacks the means to retain a lawyer.” Although in Matter of Ella B. the constitutional right to appointed counsel was established only *452 in a child neglect proceeding, the parent faces the loss of a child’s society in a divorce proceeding and therefore, I think, has the same right to present her or his case effectively.
Accordingly, I would hold that because of the importance of the rights involved, indigent matrimonial litigants are entitled, under the due process clauses of the Fourteenth Amendment to the Federal Constitution and section 6 of article I of the New York State Constitution, to be supplied with counsel whenever counsel is essential to the effective exercise of their right of access to the court.[6] This right should attach whenever the court finds that indigent parties are incapable of preparing and presenting matrimonial actions pro se, including all divorce actions in which the dissolution is contested or in which property, support and custody issues cannot readily be resolved through mediation. While my view has obvious implications for other types of civil judicial proceedings, it would not need to be determined at the present' time what other interests, if any, are sufficiently fundamental to require that counsel be provided when they are threatened. I would note only that the Supreme Court, which has been faced with this question in a filing fee case under the Federal Constitution, is in the process of distinguishing between those types of actions that involve "basic necessities” or "fundamental interests” and those that do not. (See United States v Kras, 409 US 434, 445.)
III
It does not necessarily follow from the existence of the right to be provided with counsel that proper implementation of that right requires directing a county to pay for counsel. All levels of government in New York are extremely pressed for funds and, while I believe they can constitutionally be required by courts to make expenditures that will effectuate the right of access to the courts, as in Deason (supra) I think it important that the judiciary exercise restraint where possible. Charging any level of government, where funds have not been appropriated by the Legislature, should be regarded as a *453 relatively drastic step, to be taken only after exhausting other routes. Therefore, long before mandatory action, I would suggest some of these possible routes available to the courts:
To begin with, this case involves relatively unusual circumstances, in which a Legal Aid Society had to withdraw from the case because of a conflict of interest. In the normal course of events, the Legal Aid Society would have provided representation for the appellants, as it does for many other divorce litigants each year. Indeed, the great majority of divorces for indigents are processed by the many legal aid and legal services institutions throughout the State, which are funded through a combination of Federal appropriations, State and local appropriations, and private charitable contributions. It is only in exceptional cases, involving a conflict between two clients, between a client and a witness, or, as in Tobak v Mojika (NYLJ, May 16, 1973, p 20, col 3), between a client and an overburdened organization’s numerous other clients, that the usual legal assistance mechanisms are insufficient and other methods for providing representation must in my view be found.
In such instances, the courts are not without numerous options. Some communities have two or more legal services organizations which have divided jurisdiction geographically for the representation of clients generally, but which would be willing to accept a client from outside of their usual territory at the request of a court. Courts in counties close to a law school may be able to call upon the services of a clinical teaching program, in which supervised students may represent clients pursuant to sections 478 and 484 of the Judiciary Law. Many law firms encourage their partners and associates to volunteer for pro bono cases; occasionally this practice is institutionalized, with resources pooled in an organization such as Community Law Offices in East Harlem, New York City. Lawyers are generally mindful of their very clear responsibilities under Ethical Consideration 2-25 of the Code of Professional Responsibility: "Every lawyer, regardless of professional prominence or professional workload, should find time to participate in serving the disadvantaged. The rendition of free legal services to those unable to pay reasonable fees continues to be an obligation of each lawyer, but the efforts of individual lawyers are often not enough to meet the need.” (Emphasis added.) Some Bar Associations maintain lists of lawyers willing to volunteer to assist indigents, and, where *454 lists have been established, the courts can request that Bar Associations provide names of volunteers to the court.[7]
Indeed, in our age, where the quality of life enjoyed by the individual is so greatly affected by increasing bigness—of government, of business and of other powerful institutions— there has been growing recognition by the forward-looking lawyer of the need to exert his professional skills to make legal processes more responsive to the needs and problems of all people, rich and poor alike.[8] Nor does such positive reaction to public need invade lawyers’ incomes. For we talk here of individuals who, because they fall within an appropriately fixed indigency level at which they cannot afford legal counsel from the private sector, are otherwise compelled to do without it while their rights oft die a-borning.
On the other hand, where an insufficient number of volunteers step forward, the courts may nevertheless assign counsel, and, in view of the obligation of all lawyers under EC 2-25 to represent the poor, such assignment does not constitutionally require compensation. (United States v Dillon, 346 F2d 633, cert den 382 US 978; People v Price, 262 NY 410; see Hurtado v United States, 410 US 578.) However, the fact that a court can compel an attorney to provide services without compensation does not mean that it is ordinarily wise to do so. Except, as pointed out by amicus Bronx County Bar Association, for many of the not inconsiderable number of lawyers who are only marginally able to maintain their practices, the private Bar can be expected to meet its service obligations to a substantially greater extent than it is doing at the present time.
Where, however, assignment must be made under CPLR 1102 to meet a constitutional right to counsel, the decision as to whether or not to order public payment should, I think, be on a case-by-case basis, taking into account the degree to which the Bar is currently overburdened,[9] and such factors as *455 the time that the action is likely to require and the likelihood that compensation of counsel may be obtained without invocation of the court’s power to draw on the public treasury. For example, if an indigent wife is in litigation with a solvent husband, the court may be able to require the husband to pay counsel fees under section 237 of the Domestic Relations Law.[10] And when the Supreme Court refers an issue of support to the Family Court for resolution, the Family Court has the statutory power to appoint the county attorney or corporation counsel as attorney for an indigent wife. (Family Ct. Act, §254.)
Nevertheless, there may be cases where provision of counsel is constitutionally required, but legal aid societies cannot serve, no other type of service organization exists, individual volunteers have not stepped forward, Bar Associations have not offered their aid, assigning lawyers in the community without compensation would be unfairly burdensome, the husband is unlikely to pay for the indigent wife’s counsel, and the case is not appropriate for the involvement of public counsel under the Family Court Act. It is my view that, in such instances, the court may have no choice but to charge the public purse, though, even then, it must give careful consideration to the question of whether the more appropriate body to bear the costs is the county or the State. Though I agree that it would be preferable that legislative provision be made in advance for such cases, and I have every confidence that the Legislature will do so as when it enacted article 18-B of the County Law, in response to public need for counsel in felony cases, I believe that the failure to make such appropriation cannot ultimately limit the obligation of the independent judicial branch of our government to provide meaningful access to our courts.[11]
*456 Now, in the two cases before us, since the lower court failed to determine whether they meet all of the conditions set forth above, I would decline to decide the hypothetical question as between county and State prematurely, but merely note that to select the path of the trial court in this case might inevitably lead to much greater charges being imposed on the counties having the greatest number of indigents, precisely the counties least able to bear the financial burdens. Under these circumstances, imposing the expense on the counties rather than on the State itself raises constitutional questions. (See Serrano v Priest, 5 Cal 3d 584.)
It bears mention that, legislatively, there are a broad variety of options for creatively attacking the problem. For example, legal services programs might be expanded, funds to train paraprofessionals to aid assigned counsel provided, or counsel fees for matrimonial actions included in properly-supervised welfare budgets. The Legislature also has the power to reduce unnecessary expenditure in the divorce process. For example, it might authorize the creation of a division of the Supreme Court, analogous to the Small Claims Parts of our court system, in which simple, uncontested divorces involving no custody problems and only small amounts of money could be adjudicated with relaxed requirements of evidence and procedure. Or it might provide for such uncomplicated divorces to be resolved by an administrative agency rather than the courts. I express no views whatever on the desirability of any of these devices, noting only that every expansion of the right to counsel, commencing, as already mentioned, with the right to assigned counsel in felony cases, has been followed by the co-operative efforts of the courts, the Bar and the Legislature to provide a combination of institutional mechanisms for making those rights a reality for the large numbers of citizens who must use the courts irrespective of ability to pay.
IV
The Supreme Court did not make findings on the necessity of counsel here, nor did it make findings on the unavailability of methods for providing counsel that are less drastic than charging the county for an attorney’s services. Therefore, while I agree with my fellow dissenters that the case should be remanded, I would add that the Supreme Court’s reconsideration should be made in the light of the standards suggested in this opinion.
*457 Judges Jasen, Gabrielli and Cooke concur with Chief Judge Breitel; Judge Jones dissents and votes to modify in a separate opinion in which Judge Wachtler concurs; Judge Fuchsberg dissents and votes to modify in another opinion.
Order affirmed.

. Though New York has not adopted the "no-fault” concept for the dissolution of marriage, the extent to which the proof sufficient for the granting of divorce has been eased becomes manifest from a study of the records in such very recent cases as Hessen v Hessen (33 NY2d 406), Johnson v Johnson (36 NY2d 667) and Becker v Becker (36 NY2d 787).

. While there is, of course, no precise correlation between a person’s level of affluence and his level of education, on a statistical basis low income persons are likely to be those least prepared by their own educational background to litigate actions prose.

. Other jurisdictions have also determined that indigents have a right to be provided with counsel in certain civil cases. (See, e.g., United States v Sun Kung Kang, 468 F2d 1368 [civil contempt proceeding brought to compel witness to answer Grand Jury questions]; Cleaver v Wilcox, 2 CCH Pov L Rep, par 15,381 [parents right to counsel in dependency hearing]; State ex rel. Lemaster v Oakley, 2 CCH Pov L Rep, par 18,727 [State custody hearing]; Nebraska v Caha, 190 Neb 347 [neglect; counsel to be provided at public expense]; People v Brown 49 Mich App 358 [neglect]; Matter of R.I., 455 Pa 29; Oregon v Coliman, 9 Ore App 476 [commitment proceedings].)

. Hand, Learned, "Thou Shalt Not Ration Justice”, address before the Legal Aid Society of New York (9 Brief Case, No. 4, pp 3, 5 [1951]).

. Of course, some individuals will not be able to manage even the least complex type of matrimonial case without professional assistance. For them, in my view, denial of counsel will prevent effective access to the court, and will, therefore, infringe their right to due process. Therefore, a court asked to supply, counsel even in an uncontested, relatively simple divorce action should take into account whether the party requesting help "appears to be capable of speaking effectively for himself’. (See Gagnon v Scarpelli, 411 US 778, 791.) If a party needs help, I think some form of effective assistance must be provided.

. In his now classic Note, The Indigent’s Right to Counsel in Civil Cases (76 Yale LJ 545, 555), Stanford University Law Professor Thomas Grey convincingly demonstrates that the right cannot depend on whether the indigent is plaintiff or defendant; if it did, "It will be in the interest of each to try and goad the other into first filing divorce papers; the winner in this war of nerves will emerge with a lawyer, while the loser gets none”.

. The record indicates that a local Bar Association in this case resolved not to honor the court’s request that it provide a list of attorneys for appointment in divorce actions, but I would think that the association would reconsider in light of the ethical obligations expressed in the Code of Professional Responsibility.

. Christensen (Lawyers for People of Moderate Means, Some Problems of Availability of Legal Services), American Bar Foundation, 295 (1970).

. The suggestion is not, of course, that a court must make a determination with respect to this particular factor on a case-by-case basis. It would suffice for courts to make a formal or informal annual or biannual survey of the willingness and ability of the local Bar to assist indigents; in some areas, this survey may best be performed by an administrative Judge for the Judges of his court.

. The exclusion of fee-generating matters, such as most tort litigation and other essentially contingent-fee cases, from the application of poverty law programs, like those Federally funded under the National Legal Services Corporation (predecessor of the OEO National Legal Services Program), have proved to be successful and satisfactory in lightening potential financial burdens.

. (Cf. Leahey v Farrell, 362 Pa 52, 55; Carlson v State ex rel. Stodola, 247 Ind 631; Wayne Circuit Judges v Wayne County, 15 Mich App 713, affd in part and revd in part 383 Mich 10, set aside on rehearing and Ct of App judgment affd 386 Mich 1, cert den 405 US 923; Commonwealth ex rel. Carroll v Tate, 442 Pa 45, cert den 402 US 974; 20 Am Jur 2d, Courts, § 79, n 9.) In Noble County Council v State ex rel. Fifer (234 Ind 172, 184) the court said: " 'The efficient administration of justice, which is the duty of the courts, cannot be made to depend upon the discretion or whim of the county council or any other administrative or executive officer.’ ”.