Willie Ray **BLANKENSHIP** et al.,
Plaintiffs,

v.

**W. A. (Tony) BOYLE** et al., **Defendants.**

**Civ. A. No. 2186–69.**

United States District Court,
District of Columbia.

Jan. 7, 1972.

Harry Huge, Edgar H. Brenner, Armistead W. Gilliam, Jr., Arnold & Porter, Washington, D. C., for plaintiffs.

Paul R. Connolly, Paul M. Wolff, Williams, Connolly & Califano, Washington, D. C., for defendants United Mine Workers of America and W. A. (Tony) Boyle.

John J. Wilson, Jo V. Morgan, Jr., Whiteford, Hart, Carmody & Wilson, Washington, D. C., for defendants National Bank of Washington and Barnum L. Colton.

Fred M. Vinson, Jr., Reasoner, Davis & Vinson, Washington, D. C., for defendant United Mine Workers Welfare & Retirement Fund.

James F. Reilly, Washington, D. C., for defendant Josephine Roche.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DAMAGE AND RELATED ISSUES

GESELL, District Judge.

The Court now has before it the amount of damages to be assessed and the legal fees to be awarded plaintiffs by reason of the breaches of trust found to have existed. Blankenship v. Boyle, D.C., 329 F.Supp. 1089 (1971). Four defendants are involved in this phase of the case: United Mine Workers of America, The National Bank of Washington, Josephine Roche, and Barnum Colton. All counsel have cooperated in extensive pretrial discovery, exchanging various computations and deposing different experts, following which the Court heard three days of testimony and received numerous exhibits. The matter was then orally argued to the Court and supplemental briefs filed. A number of matters must be considered to conclude this phase of the proceedings and they will be discussed *seriatim* under appropriate headings.

A. *Damages resulting from failure to invest excessive sums held, interest-free, at the Bank.*

The Court has already determined that these damages shall run from a period commencing August 4, 1966, and shall be

compensatory only. 329 F.Supp. at 1112. At issue is the period of time that should be considered for computing damages subsequent to this date; the extent, if any, to which the award should take into account various tax aspects of the Fund's operations; and, finally, the factors to be weighed in fixing the sum to be awarded.

#### (i) *Period.*

Plaintiffs urge that excessive sums remained on deposit at the Bank until September, 1971, when the account was removed from the Bank as directed by this Court's Order. The defendants, on the other hand contend that the period for fixing damages should run only until June 30, 1969, on the theory that the conspiracy in breach of trust terminated when Mr. Boyle replaced Mr. Lewis as the trustee representing the Union and Mr. Davis replaced Mr. Judy as the trustee representing the operators. The Court has determined that it will not accept either of these suggested terminal dates.

■ There is ample evidence that excessive funds remained on deposit at the Bank following Mr. Lewis's death and that whatever Mr. Boyle's intentions may have been, excessive sums were on deposit at the Bank throughout the litigation and indeed until April 28, 1971, when the Court filed its findings of fact and conclusions of law as to the merits.[1] The fact of the matter is that the breach of trust was deeply engrained by a long continuous course of improper dealing, and the momentum of the violation was never arrested by the affirmative conduct of any of the conspirators before the Court. Neither the retirement of Mr. Colton in January, 1970, nor the earlier death of Mr. Lewis terminated the breach of trust in which each had participated. Until April, 1971, when the Court filed its findings of fact and conclusions of law,

none of the four conspirators engaged in actions sufficiently affirmative and explicit to be considered an effective termination or withdrawal from the conspiracy. It was only when the Court entered its Order on May 21, 1971, decreeing various remedial changes in the administration of the Fund, that sufficient affirmative action was thrust upon the conspirators to constitute a termination of the conspiracy. *See* Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); South-East Coal Co. v. Consolidated Coal Co., 434 F.2d 767, 784 (6th Cir. 1970).

#### (ii) *Taxes.*

A more complicated and difficult issue is presented by tax considerations which are brought forward with varying emphasis by the parties. Damages awarded will be paid to the Fund for eventual distribution to the beneficiaries. The Fund is required to pay income tax on all taxable investment income which exceeds the Fund's administrative expenses. Plaintiffs urged that the award should not be reduced by any possible year-to-year tax liability and that the Fund should be assumed to have reinvested and cumulated income assumed to have been received from investment of the excessive sums without tax adjustment. Plaintiffs point to the fact that it is impossible to ascertain whether the Fund will or will not be required to pay taxes and, if so, what the amount of such taxes will be. They point to complicated accounting questions necessarily involved and to other tax uncertainties. Defendants, on the other hand, urge that payment of taxes would have reduced the amount of income available for reinvestment and that a damage claim that fails to recognize this is unrealistic. Thus plaintiffs complain of the possibility of double taxation if allowance is made for taxes in the Court's award of damages and then the award itself is subsequently taxed,

---

1. In April, the Fund's books alone still showed some $14 million uninvested. In fact, there were excessive sums at the Bank and at the Fund after this date but since the decision directed a procedure for eliminating these sums, the Court feels the defendants were relieved by carrying out these directions promptly thereafter.

and defendants contend that some tax adjustment is necessary in the interest of fairness.

■ The Court has concluded that the possible but by no means certain application of some kind of tax to the award should be ignored and that the award should be made without allowing any opportunity to reopen the matter if any adverse tax consequences eventuate.

■ This determination is strongly reinforced by an aspect of the decision which has been uppermost in the Court's mind throughout the proceedings relating to damages. The record thoroughly establishes that the trustees were always extremely tax conscious. A damage computation in this case must recognize that the trustees functioning as prudent individuals, absent the conspiracy to breach trust, would have conducted the affairs of the Fund in a manner to minimize or avoid taxes. Accordingly, the Court will compute damages on the assumption that the excessive funds would all have been invested only in tax-free municipals. This is consistent not only with the reality of the Fund's tax situation, but wholly consistent with investments made by the Fund during the period under review.

Thus the award of damages to be made is an award of damages in the form of reconstructed income from an investment in tax-free municipals and the reinvestment of any interest obtained on such municipals again into tax-free municipals.

(iii) *The damages.*

■ This brings the Court then to a determination of the amount of the award. Before discussing the evidence in more detail it may be appropriate to indicate the standard to which the defendants responsible in damages must be held. The award must be of an amount representing what prudent trustees at-

tempting to maximize tax-free income absent a conspiracy could reasonably be expected to have earned for the beneficiaries. Plaintiffs apparently accept this standard, but they have offered computations which the Court believes are inconsistent with its proper application.

From August 4, 1966, until April 28, 1971, the average daily balance on the Fund's books averaged around $50 million, reaching a peak of $87 million in May, 1968, and decreasing to about $20 million in early 1971. During this same period, the average daily float, or the difference between the average daily balance as shown on the Bank's books as compared with the average daily balance as shown on the Fund's books, ranged, month-to-month, from $2.9 million to $8.8 million. Following the Court's opinion in April, 1971, The Riggs National Bank won the competitive bidding for the Fund's account with a draft system which required a daily balance on the Bank's books of only a little over $1 million to compensate the Bank for its services. During the damage period, funds that actually were invested by the Fund performed at an overall yield of 5.39%.

Plaintiffs estimate the damages due to the excessive sums kept in demand deposits in the Bank to be at somewhat above $17 million. In support of this claim, plaintiffs presented the testimony of Dr. Roger Murray, an extremely experienced, informed, sophisticated money manager. The techniques used by Dr. Murray presented a comprehensive investment plan. He assumed that the Fund would maintain a minimal balance of $1,000 on its books and aided by the advantage of hindsight he reconstructed a sophisticated investment program which assumed different amounts in various types of balances and different types of investments with varying levels of yield for each separate balance.[2] His

2. The basic elements of Dr. Murray's investment scheme were as follows: All of the sums available for investment, less $1,000, would be invested in U.S. Treasury obligations. From $6 million to $10 million, equal to 50 percent of month-

ly disbursements, would be invested in 90-day Treasury bills, available on half-hour notice to cover the fluctuation in cash needs. To cover the possibility of a work interruption causing a decline or delay in royalty payments, $6 million

computations contemplate immediate re-investment of interest on a continuing month-by-month basis in desirable types of Government securities. Overall, Dr. Murray's reconstructed investment program would have resulted in an average yield of 5.85%.

■ The Court has no doubt the techniques used by Dr. Murray were available, albeit highly specialized, and that a result such as he has reconstructed might have been achieved under proper techniques of money management. But the Court is unwilling to accept this approach since it reflects a higher level of investment conduct than could reasonably be expected of a prudent trustee responsible for this particular Fund at the time. The Court has concluded that it would be prudent and within the permissible legal standard for the trustees to maintain a larger balance uninvested on the Fund's books pending periodic meetings of the trustees, and that it would be entirely prudent to place all of the funds in municipals, without establishing different balances for different types of investment,[3] rather than to seek the higher returns available by placing substantial sums in longer term taxable government obligations. The Fund was already diversified to some extent, holding certificates of deposit, utility securities, and some long-term United States governments.

■ Various computations based on money shown available on the Fund's books have been presented in addition to the analysis prepared by plaintiffs' expert. The Court has before it figures which disclose the amount of interest that would be earned at various yields assuming various uninvested balances. The effect of different underlying procedures for ascertaining and cumulating interest available for reinvestment have been measured. The Court also has avail-able information indicating rates of return that were earned by various un-named pension funds, by the life insurance industry, by the Teachers Insurance Annuity Association, by the New York State Retirement System, and of course full information as to the actual earnings by the Fund itself on money that was invested by the Fund. The final judgment must take these and other factors, many of them imponderable, into account.

There was also considerable proof directed to the size of cash balances the Fund might reasonably be expected to keep uninvested as per its books. Various balances were suggested by relating the suggested amounts to average monthly disbursements. These computations contrasted with the experience of money managers that no balance is actually necessary where an effort is seriously made to maximize income. The Court has sharply discounted the need to adjust for this factor because of the highly liquid nature of the Fund's portfolio and the steady repetitive character of its receipts.

■ After the most thorough examination and re-examination of all of the materials, the Court has arrived at a damage award of $11.5 million as of April 18, 1971, using as general guidelines an assumed investment in tax-free municipals, a rate of return of approximately five percent, with allowance for retaining uninvested on the books of the Fund a cushion in the range of $3–$5 million.

### B. *Damages resulting from certain utility stock investments.*

A further claim for compensatory damages relates not to the maintenance of excessive sums at the Bank but to losses allegedly arising from the Fund's investment in securities of Kansas City Power & Light Company and Cleveland Electric

---

would be invested in nine- to twelve-month Treasury obligations spaced to adjust cash flow. All the remaining amounts would be invested in Treasury obligations with three- to five-year maturities with appropriately spaced maturity dates.

3. It is generally agreed by all the parties and the Court concurs that under the circumstances of this trust fund a diverse common stock portfolio would not have been attempted in this period by a prudent trustee.

Illuminating Company. The impropriety underlying these investments was discussed in the prior opinion. 329 F.Supp. at 1105, 1106.

■ Plaintiff's theory of computing damages, which on this aspect of the case would be assessed only against Miss Roche and the Union, is to reject the investments as of August 4, 1966, the Court-imposed cut-off date for damages, and to reinvest the sums involved in three- to five-year governments. By this method, which attempts to take advantage of the three-year statute of limitations, plaintiffs arrive at a damage figure in the neighborhood of $2 million. This approach is inconsistent with established theories of damages in cases of this kind. The investment must be rejected at the time of purchase, not at an artificial statute of limitations cut-off date. Then a comparison should be made of dividends received and increase in fair market value of the securities, with the legal rate of interest during the entire period the stock was held. 3 Scott on Trusts, § 210 (3d ed. 1967). On this basis, in fact, the Fund did substantially better than it would have done if the investment had been treated as rejected from the time of purchase.

■ It would be inequitable and improper to permit plaintiffs to accept the investment up to the start of the three-year period while the fair market value was increasing and then to reject the investment only when the fair market value began to go down. The plaintiffs cannot have it both ways. The Court's three-year limitation period cannot be utilized to provide an undeserved bonus. Accordingly, no damages will be awarded on this aspect of the case.

C. *Attorneys' fees.*

■ As to the matter of attorneys' fees, the Court after hearing argument and considering briefs has concluded that inasmuch as this action is in the nature of a derivative action, attorneys' fees should be assessed against the Fund for the recovery accomplished, which is in the interest of all the beneficiaries. Plaintiffs' counsel have maintained elabo-

rate, careful records of time logged and expenses incurred and have presented these by appropriate applications which have been thoroughly reviewed. Since the fees are to be awarded against the Fund, no objection is raised by the Union or the Bank to the amount claimed. The records have been reviewed by counsel for the Fund. The Fund does not question the amount of time logged, the reasonableness of the time charges used or the propriety of the disbursements. The Court is also entirely satisfied as to the reasonableness and accuracy of these figures.

■■ The Court has been informed that disbursements for expenses have amounted to $94,304 and there is no doubt these disbursements were reasonably and necessarily made. Plaintiffs are only entitled to their taxable costs, however, and no award for disbursements will be made beyond such costs, which in this instance shall include cost of transcripts for all depositions and trial, witness and process fees, filing fees, and reasonable travel costs and disbursements to attend depositions scheduled by any defendant. As for attorneys' fees, 14,886 hours were logged which at time charges applied amounts to legal fees of $661,000, or about $45 per hour. Plaintiffs believe that regular time charges would not be equitable because of the monetary and equitable benefits obtained and the complex and somewhat novel issues of this case. The Court agrees. Counsel have shown skill and diligence and time charges are but one measure of the reasonableness of a fee. Since time logged on the equitable phases of the case was intimately related to the damage recovery and since the recovery was substantial, the Court has fixed a reasonable fee at $825,000 for services performed to date. These fees are to be paid when the damages here assessed are paid to the Fund. A larger award could easily be justified by applying standards that have been used in comparable situations. The fact of the matter is that plaintiffs' counsel have not sought to profit unduly by their undertaking, which has gone forward in an

effort to assist a widely scattered group of pensioners and other beneficiaries, none of whom are shown to have any financial substance. This approach to the fee question is commendable.

### D. *Form of judgment.*

The form of the judgment must now be considered. Counsel for Miss Roche points to various findings of the Court to the effect that Miss Roche did not profit personally from the breach of trust and suggests that the Court should limit her liability to a specific sum, giving consideration to various equities in the situation, including her age and present health. It is of course obvious that where individuals and large entities engage collusively in a breach of trust the impact of any judgment may be far more severe on an individual than it is on an entity such as the Bank or the Union. Some of the considerations advanced with respect to Miss Roche have lesser but still pertinent application to Mr. Colton.

Miss Roche was directly involved in the breach from the outset. By throwing her vote as neutral trustee on the side of the Union, she enabled the Union and the Union's Bank to profit to the detriment of the beneficiaries. Mr. Colton was also personally involved as the findings show. The United Mine Workers of America moved on November 5, 1971, to amend its answer to set forth a claim for contribution against defendants Colton, Roche and National Bank of Washington. These three latter parties have indicated similar cross-claims will be filed against the Union and the other damage defendants. The Union's cross-claim may be filed but no answer will be required and all parties are granted leave to cross-claim against others for contribution by a date to be set following appellate review of this damage judgment.

There is no authority which authorizes the Court at this stage to apportion in variable amounts the damages among the four participants.[4] Nor is it proper for the Court to attempt to resolve at this time the intricacies of the law of contribution as it may apply to various facets of this case. The judgment must be entered jointly and severally as to each and will be entered in this form with provision for simple interest at the rate of six percent.

At the time defendants asked for a stay of the equitable relief previously ordered, the Court in refusing the stay indicated that different considerations would prevail as far as a stay of money judgment is concerned. The equitable relief has been allowed to stand preliminarily by the Court of Appeals and a comprehensive compliance report has since been filed by the trustees. But there is no reason in this instance, given the solvency of the Union and the Bank, not to stay the money judgment, without bond, if this is desired, so long as it is clearly understood that simple interest will continue to run.

Accordingly, an appropriate form of order consistent with these findings and conclusions shall be submitted within five days. Plaintiffs shall have their costs.

---

4. *See, generally*, Nordstrom v. District of Columbia, 213 F.Supp. 315 (D.D.C.1963), affirmed, 327 F.2d 863, 117 U.S.App. D.C. 165; Martello v. Hawley, 300 F.2d 721, 112 U.S.App.D.C. 129 (1962) ; 16 Am.Jur.2d § 48; 18 Am.Jur.2d § 38.