Elliott POSTOW and Joan Postow,
Plaintiffs,

v.

ORIENTAL BUILDING ASSOCIATION,
Defendant.

Civ. A. No. 2017–73.

United States District Court,
District of Columbia.

July 6, 1978.

See also, 390 F.Supp. 1130.

Benny L. Kass, Steven A. Skalet, Washington, D. C., for class plaintiffs.

Jay S. Weiss, Washington, D. C., for plaintiffs Mr. and Mrs. Morton Schrier.

Thomas S. Jackson, Patricia D. Gurne, James A. Crooks, Washington, D. C., for defendant.

## MEMORANDUM OPINION

WILLIAM B. JONES, District Judge.

This Court heretofore found for the class plaintiffs on their claim that defendant did not comply with the timely disclosure requirement of the Truth in Lending Act (15 U.S.C. sec. 1639(b)).[1] Thereafter on November 3, 1977, this Court found that class plaintiffs were entitled to $22,350.42 statutory damages.[2] Since then class plaintiffs have petitioned for an award of attorneys' fees and costs, which defendant opposes. In addition to the question of attorneys' fees, class plaintiffs seek a review by the Court of the Clerk of Court's disallowance of certain claimed costs and defendant's opposition to such a review as well as its contention that class plaintiffs are not entitled to any costs.

Class plaintiffs' claim to an award of attorneys' fees and costs is based on the following provision in the Truth in Lending Act:

(a) Except as otherwise provided in this section any creditor who fails to comply with any requirement imposed under this part or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(3) In the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. 15 U.S.C. § 1640.

Plaintiffs have petitioned for attorneys' fees calculated at $75.00 an hour for approximately 270 hours' work and for a matching bonus award to compensate them for the risks involved in litigation prosecuted for a fee contingent on success. Plaintiffs have also petitioned for attorneys' fees for the services of "law clerks" calculated at $30.00 an hour for approximately 40 hours. Finally, plaintiffs seek costs which were denied by the Clerk of the Court for a $1,414.20 fee charged by plaintiffs' expert witness and for $452.82 spent by the attorneys in out-of-pocket disbursements and in taking depositions.

### I.

While the statute authorizes the Court to award reasonable fees, in determining what is reasonable the Court must consider the twelve factors delineated in *Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 503 F.2d 177 (1974). In structuring their memoranda to the Court on this determination, the parties have treated with those factors. Defendant has additionally asserted two threshold challenges to the award of any fees in this case: first, it attacks the constitutionality of the statutory provision for fees to prevailing plaintiffs and not to prevailing defendants as denial of due process to and equal protection for defendants in Truth in Lending litigation; second, it asserts that plaintiffs were not "successful" in this action as required by the express language of the provision.

Defendant's constitutional challenge raises what may either be phrased a due process or an equal protection issue by its contention that the unilateral award of attorneys' fees to successful plaintiffs impairs creditors' access to the courts to defend themselves against allegations of violating the Truth in Lending laws. Defendant states that this discrimination presents creditors with a no-win alternative in going to court: if they succeed in their defense, they are still out the cost of litigation which may exceed the penalty for the alleged violation; if they fail, they are then liable for the cost of the plaintiffs' prosecution in addition to their own litigation expenses and any damages that may be awarded.

---

1. See Court's Memoranda and Orders dated March 14, 1975, 390 F.Supp. 1130, May 7, 1975, and March 22, 1976.

2. See Court's Memorandum and Order dated November 3, 1977.

The defendant cites *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) as support for its constitutional position. There the Supreme Court held that it was a violation of due process for a state to deny access to indigents to the state's divorce courts because of a filing fee that such indigents were unable to pay. Justice Brennan concurred on the ground that denial of judicial process to persons on the basis of wealth was a denial of equal protection of the laws. *Boddie* was subsequently elaborated upon and clarified by the Court in *United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). In *Kras,* the Court noted that the *Boddie* case involved the absolute denial to the indigent-plaintiffs of the only legal avenue to adjust the marital relationship and the fundamental associational interests that surround the establishment, maintenance, and dissolution of that relationship. The Court strongly emphasized the basic importance of marriage to society and the state's monopolization of the divorce process, noting that the holding in *Boddie* was expressly restricted to the constitutional concerns evoked by this particular combination. In *Kras,* the Court refused to extend this limited holding to the similar denial of access to federal bankruptcy courts to indigents unable to pay a filing fee. The Court dismissed due process concerns because it noted that the adjustment of the creditor-debtor relationship at issue in *Kras* was not in the exclusive control of the government, but that the parties had the option of private settlement "[h]owever unrealistic [that] remedy may be in a particular situation." 409 U.S. at 445, 93 S.Ct. at 638. Nor did the Court find in *Kras* that the creditor-debtor relationship and its adjustment through federal bankruptcy proceedings concerned a fundamental interest or that debtors were a suspect class such that the Court must scrutinize the filing fee requirement for a "compelling governmental interest" necessary to sustain its constitutionality under either due process or equal protection analysis. Rather, the Court found that this financial bar to the bankruptcy courts concerned matters of economics and social welfare for which the applicable standard in determining the propriety of Congress' action is that of "rational justification." The Court found a rational justification for the fee requirement to be readily apparent: a self-sufficient system paid for by its users rather than by the general taxpayer. 409 U.S. at 446, 93 S.Ct. 631.

In the present case the provision of attorneys' fees to successful plaintiffs and the denial of attorneys' fees to successful defendants does not bar the latter's access to the courts. It may encourage settlement, but it does not force it. Moreover, the very availability of settlement cuts against defendant's constitutional challenge because it removed the due process concern found in *Boddie* in the government's monopolization of the legal means to adjust a relationship. As in *Kras,* the creditor-debtor relationship present in the instant case involves no fundamental interest and the discrimination of plaintiffs over defendants effects no suspect classification that compels this Court to scrutinize the attorneys' fees provision for a compelling governmental interest.

The Court must therefore inquire only as to the existence of a rational justification for the discriminatory award of attorneys' fees provided by the Act. Such a justification is readily apparent: to provide for the supplementary enforcement of the Act by encouraging suits brought by injured consumers.[3] Numerous courts have recognized that the Congress intended such supplementary enforcement by these so-called "private attorneys general." E. g., *McGowan v. Credit Center of North Jackson, Inc.,* 546 F.2d 73, 77 (5th Cir. 1977); *Sosa v. Fite,* 498 F.2d 114, 121–122 (5th Cir. 1974); *Ratner v. Chemical Bank New York Trust Co.,* 329 F.Supp. 270, 280 (S.D.N.Y. 1971). Alleged violations of the Act run into the thousands with over ten thousand law suits filed so far and more being filed each day at a rate of greater than two

---

**3.** 15 U.S.C. § 1607 provides for the administrative enforcement of the Truth in Lending Act.

thousand suits a year.[4] Most of these suits are for statutory rather than actual damages, because of difficulties in proving the latter or the purely technical nature of the violation.[5] Statutory damages, however, have somewhat conservative maximum limits, making it not unusual for the costs of litigation to exceed the damages awarded.[6] Without fee awards, therefore, consumers would have little practical incentive and perhaps even less financial ability to bring suits under the Act.

It might be argued that discrimination could have been avoided by making fee awards available for both parties. There is no question that defendants can be awarded attorneys' fees when plaintiffs bring suits in bad faith. *See Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 258–259, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). But to provide attorneys' fees to successful defendants against plaintiffs who have acted in good faith would obviously retard, if not totally frustrate, the encouragement of supplementary private enforcement of the Act.

In a different legal context, the Supreme Court has identified two equitable considerations which support a finding of a rational justification for the discriminatory award of attorneys' fees to successful plaintiffs. In *Christianburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the Court outlined a judicially created discrimination between parties for courts to consider in the award of attorneys' fees to "prevailing parties" as provided by Title VII of the Civil Rights Act of 1964, *as amended:* 42 U.S.C. section 2000e–5(k).

There, the Court ruled that prevailing plaintiffs should be awarded attorneys' fees in "all but special circumstances," and that prevailing defendants should be awarded fees only when plaintiffs' suits are "frivolous, unreasonable, or without foundation." The Court made this ruling despite the otherwise obvious inference of equal treatment in the phrase "prevailing parties," because it found that: (1) "the plaintiff is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority" and (2) an award to a successful plaintiff is an award against "a violator of federal law."

These same equitable considerations are present in the attorneys' fees provision in the Truth in Lending Act and support a finding of a rational basis for the discriminatory effect of the provision. The express purpose of the Truth in Lending Act is "to assure the meaningful disclosure of credit terms so that consumers . . . [can] avoid the uninformed use of credit. . ." 15 U.S.C. section 1601. The obvious beneficiaries of the Act are the consumers. If the 2,000 plus suits filed each year[7] represent even the majority of the alleged violations of the Act, the government has the option of creating a substantial bureauracy to detect and prosecute these numerous alleged violations or to rely on the self interest of the injured consumer to perform these tasks.[8] The latter option is undoubtedly more cost efficient from the government's standpoint and is probably more efficient overall, assuming that consumers are in a better position to detect violations committed against them than some government

4. C. Felsenfeld, et al., *Consumer Credit Regulation: Illusion or Reality?* 33 Bus.Law. 1145, 1148 (1978).

5. See S.Rep.No.93–278, 93d Cong., 1st Sess. p. 14 (1973) (hereinafter S.Rep.93–278).

6. For example, *Gillard v. Aetna Finance Co., Inc.,* 414 F.Supp. 737 (E.D.La.1976) ($1,400 attorneys' fees for a legal aid lawyer; $635 statutory damages); *Pedro v. Pacific Plan,* 393 F.Supp. 315 (N.D.Cal.1975) ($3,000 attorneys' fees; $2,000 statutory damages); *Burley v. Bastrop Loan Co., Inc.,* 407 F.Supp. 773 (W.D. La.1975) (statutory fees barred by statute of limitations, but attorneys' fees authorized);

*Starks v. Orleans Motors, Inc.,* 372 F.Supp. 928, 933 (E.D.La.), aff'd 500 F.2d 1182 (5th Cir. 1974) ($644 statutory damages; attorneys' fees $2,000); *Welmaker v. W. T. Grant Co.,* 365 F.Supp. 531 (N.D.Ga.1972) ($380 statutory damages; $17,500 attorneys' fees).

7. C. Felsenfeld, *et al., Consumer Credit: Illusion or Reality?* 33 Bus.Law 1145, 1152 (1978).

8. The Court notes that the provision of civil penalties in the Act is "to provide creditors with a meaningful incentive to comply with the law without relying on an extensive new bureaurracy." Sen.Rep.No.93–278, p. 14.

agency would be. Because private litigation is as a supplement, rather than as an alternative to public enforcement of the Act, its encouragement through attorneys' fees and damages cannot help but effect a fuller compliance with the Act.

As to the second consideration expressed in *Christianburg,* unsuccessful defendants under the Truth in Lending Act are also violators of federal law. Tacking an award of attorneys' fees onto the actual and statutory damages available under the Act may well help to reduce the numbers of such violators by encouraging creditors to comply voluntarily with the Act.

Finally, the Court notes that the need for such equitable considerations is not as great in the present case, for here there is an express statutory provision establishing a discriminatory scheme, whereas in *Christianburg* a similar scheme was established by judicial inference. The courts' discretion in the area of attorneys' fees is limited.

As the Supreme Court noted in *Alyeska,* "the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." 421 U.S. at 262, 95 S.Ct. at 1624. In both *Alyeska, supra,* 421 U.S. at 264 n. 37, 95 S.Ct. 1612, and in *Christianburg, supra,* 98 S.Ct. at 697 & nn. 5 & 6, the Supreme Court has implicitly recognized that the discriminatory provision of attorneys' fees to only successful plaintiffs is a legitimate legislative option for Congress to adopt, and, in fact, expressly cites in both these cases the instant provision of the Truth in Lending Act as an example of Congress' exercise of its discretion in this area. 421 U.S. 261 n. 34, 95 S.Ct. 1612; 98 S.Ct. 697 n. 5.

In view of the foregoing, the Court finds that the encouragement of the private enforcement of the Truth in Lending Act by injured consumers against alleged violators of federal law provides a rational basis for the Act's discriminatory attorneys' fee provision to sustain its constitutionality as it has been challenged by the defendant in this case.

Defendant's second threshold challenge asserts that plaintiffs were not "successful" in this action as required by the Act's provision for attorneys' fees. Specifically, defendant refers to the language of the provision which permits attorneys' fees "in the case of any successful action to enforce the foregoing liability. . . ." Defendant's challenge has two bases: (1) that the Court dismissed the more significant claim of the two asserted in plaintiffs' complaint, and (2) that the Court, not the plaintiffs' attorneys, developed the legal analysis upon which the Court granted judgment to the plaintiffs.

■ As a practical matter, plaintiffs were as successful as they could be in this particular action. The Act allows only one recovery per consumer credit transaction regardless of the number of separate violations of the Act committed. 15 U.S.C. section 1640(g). Nothing in the provision or in the rest of the Act justifies an inference that "success" means something other than being awarded judgment on the merits. Even judgments based on technical violations are successes, for the Act itself is highly technical and Congress has provided for such technical successes by the provision of statutory damages. In any case, the success of plaintiffs in the present case has substantial merit, even if it does lack the element of actual damages, because it pinpoints the proper time for disclosure in a common commercial transaction and thereby effects the express purpose of the Act of providing useful, timely disclosure of consumer credit terms. *See* 15 U.S.C. section 1601.

■ The second base of this threshold challenge, consideration of the Court's independent input and analysis into the final decision on the merit of plaintiffs' "successful" claim, is directed at the personal contribution of the plaintiffs' attorneys to the resolution of this case and to the addition of legal insight and guidance in this continually developing area of the law. Review of the Court's Memoranda and Orders filed in this case discloses that defendant's contention is not totally without merit. But the

merit that it does have is not sufficient to justify the complete denial of fees. Instead the Court will defer this point for later consideration in the immediately following determination of the reasonable amount of attorneys' fees to award.

## II.

In *Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 503 F.2d 177 (1974), our Court of Appeals adopted the Fifth Circuit's delineation of the various factors for courts to consider in determining the reasonableness of attorneys' fees: [9]

1. The time and labor required;
2. The novelty and difficulty of the questions presented in the case;
3. The skill required to perform the legal services properly;
4. The preclusion of other employment by the attorneys due to the acceptance of the case;
5. The customary fee;
6. The type of fee charged: contingent or fixed;
7. The time limitations imposed by the client or circumstances;
8. The amount involved and the results obtained;
9. The experience, reputation, and ability of the attorneys;
10. The undesirability of the case;
11. The nature and length of the professional relationship with the client;
12. The awards in similar cases.

### 1. The time and labor required.

Plaintiffs' attorneys spent approximately 270 hours on this case and employed "law clerks" for an additional 40 hours of work. The time spent by the attorneys has been adequately documented by affidavits which specify hours and dates of work on individual aspects of the case. Documentation for the time claimed for the law clerks was included in these same affidavits, but was of the most general nature, listing only hours worked each month with no indication of the type of work performed. De-

fendant asks the Court to reduce the hours claimed for the amount of time spent on the "unsuccessful" claim and to deny any fees for the law clerk time as unauthorized in a claim for *attorneys'* fees.

Defendant cites *Richardson v. Communications Workers,* 530 F.2d 126 (8th Cir. 1976), *cert. denied,* 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1977), in support of its request for a reduction. *Richardson* is a far different case from the one at hand. In *Richardson,* two claims were tried together, but a new trial was granted for the second claim which was then retried and appealed separately and unsuccessfully by the plaintiff. In the present case, the two claims were briefed and considered in one motion. There was no independent litigation of either claim. It would be probably impractical to require the attorneys to identify how much time was spent on the unsuccessful claim. The Court notes that the attorneys were working in a constantly evolving area of the law. The prosecution of the unsuccessful claim was a reasonable effort even though hindsight now shows it to have lacked merit and, in light of the aforementioned single recovery rule, to have been unnecessary. Reduction of the attorneys' fees because of an unsuccessful claim brought in good faith would needlessly penalize the attorneys for being unable "to divine the exact parameters of the courts' willingness to grant relief" and be contrary to the Congressional policy of encouraging private enforcement of the Act. *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 684 (N.D. Cal.1974), *aff'd* 550 F.2d 464, 466 (9th Cir. 1977); reversed on merits and propriety of the award of attorneys' fees not considered, *Zurcher v. Stanford Daily,* — U.S. —, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). *See McGowan v. Credit Center of North Jackson, Inc.,* 546 F.2d 73 (5th Cir. 1977).

The Court does find merit in defendant's opposition to an award of fees for the work performed by lawclerks. Plaintiffs cite no authority for the proposition that attorneys' fees should be awarded for the work of

---

**9.** *See also ABA Code of Professional Responsibility, Disciplinary Rule 2–106(B).*

persons who are not attorneys. *See Hannon v. Security Nat. Bank,* 537 F.2d 327 (9th Cir. 1976) (a law school graduate, who was not licensed to practice law and who had represented himself in successful Truth in Lending litigation, held not entitled to attorneys' fees). The Court notes that the expenses of paralegal services are recoverable, either as fees or as costs, in successful antitrust actions. *See e. g., Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1210 n. 19 (9th Cir. 1975), cert. den., 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); *Computer Statistics, Inc. v. Blair,* 418 F.Supp. 1339 (S.D.Tex. 1976); *Pacific Eng. & Production Co. v. Kerr-McGee,* 21 F.R.Serv.2d 404 (D.Utah 1976). Such fees may be appropriate in complex antitrust cases where highly trained, specialized paralegals perform services that would otherwise be performed by young attorneys.

■ As noted before, however, the documentation submitted .on the lawclerks employed by plaintiffs' attorneys is incomplete. It does not indicate the qualifications of these lawclerks or specify the work performed. The Court is therefore unable to discern whether the lawclerks performed services that would have otherwise been performed by the attorneys or whether they performed administrative tasks or general legal research, either of which would be more properly included in the attorneys' hourly rates as part of their general overhead costs. Even if the Court were disposed to award fees for the work of these clerks, the incomplete documentation gives the Court no guidance in determining what would be reasonable rates to charge for their hours claimed. The November 3, 1977 Memorandum of this Court directed plaintiffs to "support their claim for fees by appropriate affidavits particularizing the time spent and the matters involved." Plaintiffs and their attorneys have failed to do this. The Court will not award fees the legality of which has not been briefed and the reasonableness of which cannot be determined.

## 2. The novelty and difficulty of the issues.

This case has been vigorously litigated over a four year period. Defendant's actions and omissions set the pace for the suit. Early in the case, before the certification of the class and before even the discovery regarding the class was completed, the defendant filed a motion to dismiss which presented two questions of first impression: the requirement of Truth in Lending disclosure at the time of the contractual commitment for the mortgage loan and the application of the Act's statute of limitations to this action. The motion also challenged the first claim of the plaintiffs that fees for owner's title insurance should be included in the computation of a finance charge for the purpose of disclosure. The Court found that such fees were expressly exempted by the Act. 15 U.S.C. section 1605(e).

The Court's decision on the motion resulted in a ruling on the merits in favor of the defendant as to the first claim and against it as to the second claim. Furthermore, the Court granted, over defendant's objections, plaintiffs' motion to maintain the action as a class action. Court's March 14, 1975 Memorandum and Order. Subsequently, the Court granted the oral motion of the plaintiffs for summary judgment on the second claim. Court's May 7, 1975 Memorandum and Order. Having lost on the merits, defendant then challenged the Court's certification of the class on the ground that *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), precludes such post-judgment certifications. The Court rejected this argument because it was defendant which precipitated the early decision on the merits and which had successfully sought the postponement of discovery regarding the class until after that decision. Court's March 22, 1976 Memorandum and Order. After this rejection, the plaintiffs proceeded with discovery, part of which was strenuously resisted by the defendant and which will be considered, *infra,* in the discussion of the plaintiffs' request for costs. Finally, the defendant challenged the award of statutory damages absent a showing of actual damages. The Court rejected this argu-

ment principally on its reading of the plain language of the Act and of the Act's legislative history. Court's November 3, 1977 Memorandum.

■ As this skeletal history of the case shows, it did involve several novel and somewhat complex issues. In light of these issues and the defendant's tenacious defense of its position on each, the Court finds that the 270 hours spent by plaintiffs' attorneys on the case to be reasonable and will not reduce those hours. On the other hand, the Court does not find that the issues and their treatment by plaintiffs' attorneys was such that an increase in the hours claimed or, more appropriately, an increase in the hourly rate assessed for the attorneys' services is warranted. The briefs and arguments of plaintiffs' counsel were helpful to the Court, but often they provided only a mere impetus to the Court's ultimate resolution of the issues. On some of the key issues, such as the application of the Act's statute of limitations, and the appropriate statutory damages, the Court was required to rely on its own investigation and analysis of precedents and the Act's legislative history to reach its final decision. Thus, the Court notes that the attorneys' overall treatment of the issues was adequate, but not of such an unusually good quality to merit an increase in the fees awarded. *See Lindy Bros. Builders, Inc. v. America Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168–169 (3rd Cir. 1973).

*3. The skill requisite to perform the legal services properly.*

As was touched upon immediately above, plaintiffs' attorneys had the necessary skill to address the substantive issues adequately, and they also had the required skill to handle the procedural difficulties inherent in prosecuting a class action.

*4. The preclusion of other employment.*

Plaintiffs' attorneys do not claim a specific, direct preclusion of other employment, but they assert that they have an "active practice" so that the 270 hours spent on this case forced them to turn down employment.

It is difficult for the Court to accord any weight to this factor in light of this broad, unsupported statement. Furthermore, the Court finds some merit in defendant's contention that the publicity surrounding this case may well generate future offers of employment that will more than compensate the attorneys for their present, unspecified lost opportunities.

*5. The customary fee.*

■ Plaintiffs state that the customary fee charged by both their attorneys and by attorneys of comparable skill is $75.00 an hour. The Court takes notice that such an hourly rate is reasonable for experienced lawyers in the Washington, D. C. area for the work that was performed in this case. As defendant points out, however, the younger of plaintiffs' two attorneys was but two years out of law school at the instigation of this suit. The affidavits filed by the attorneys also disclose an apparent partner-associate relationship between the attorneys with the younger attorney conferring with the senior attorney and preparing memoranda, motions, and briefs which were later reviewed by the senior attorney. The time spent in conferences and on drafts and reviews does not appear to be unduly repetitive or overlapping that a reduction of the hours claimed would be appropriate. *See Parker v. Matthews*, 411 F.Supp. 1059, 1067 (D.D.C.1976), *aff'd* 182 U.S.App.D.C. 322, 561 F.2d 320 (1977); *United Federation of Postal Clerks v. United States*, 61 F.R.D. 13, 19 n. 16 (D.D.C. 1973). But, when added to the consideration of the younger attorney's relative inexperience at the outset of the case, this apparent relationship provides a clear signal to the Court that a reduction of the rate charged for the younger attorney's services is in order. The Court will accordingly set the rate of compensation for the work of the younger attorney, whose hours, incidentally, represent approximately two thirds of the total hours claimed, at $60.00 an hour.

*6. Whether the fee is fixed or contingent.*

Attorneys typically charge higher fees for work performed on a contingency fee

basis to compensate the attorneys for the risk factor in such employment. Some courts have attempted to incorporate this consideration into their statutory award of attorneys' fees by adding "bonus" or "incentive" awards commensurate with the risk of loss undertaken. *See, e. g., Lindy Bros. Bldrs. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976); *Pete v. UMW Welfare & Retirement Fund*, 171 U.S.App.D.C. 1, 517 F.2d 1275 (1974); *National Assoc. of Regional Medical Programs, Inc. v. Weinberger*, 396 F.Supp. 842 (D.D.C.1975) rev'd 179 U.S.App.D.C. 154, 551 F.2d 340 (1976), *cert. denied*, 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977). The risk of loss to the attorneys dissipated early in this action when the plaintiffs prevailed on the merits by the Court's March 1975 decision on the defendant's motion for summary judgment. With success on the merits, the attorneys were assured of receiving reasonable compensation for their efforts because of the Act's mandatory provision of attorneys' fees. At that time, the attorneys had logged approximately 30% of the total hours now claimed and still had the bulk of their work concerning the class action, such as discovery, notification of the class, and the determination of statutory damages before them.

A second reason given for bonus awards for contingency litigation is to attract more lawyers into accepting such cases where a public benefit might be conferred by their success. This consideration is especially appropriate in areas of litigation generally considered undesirable by the bar. This case does confer a public benefit, but it is difficult to quantify how great a benefit or how much of the benefit is the result of the work of the plaintiffs' attorneys. As noted above, the attorneys often provided merely the impetus for the Court's decision on the several issues raised in the case. Finally, the Court notes that consumer litigation is not an undesirable area of practice in this age of consumerism.

▉ In light of the limited nature of attorneys' risk in litigating this case, their limited personal contribution to the aspects of the case conferring a benefit to the public as well as to their clients, and the general acceptability of Truth in Lending litigation, the Court finds that the base award it will make to the plaintiffs' attorneys will adequately compensate them for the risks they assumed in prosecuting this case on a contingency fee basis, sufficiently reward them for their contributions to the public's benefit, and encourage other attorneys to bring such meritorious litigation.

*7. Time limitations imposed by the client or the circumstances.*

Plaintiffs assert that the short statute of limitations provided by the Act required their attorneys to research and prepare for the basic suit in a "relatively short period of time." Defendant counters with the unrefuted assertion that the named plaintiffs in the basic suit had retained these attorneys as their counsel in the loan transaction on which the basic suit was brought. Thus, the attorneys had the full statutory time within which to file this suit. They stand in the same position as any other attorney who represents a client in a Truth in Lending suit and the Court is not inclined to rule that every such attorney should automatically have his attorneys' fees increased because Congress has decided that suits should be filed soon after the alleged violations occur.

*8. The amount involved and the results obtained.*

This factor is not as determinative in Truth in Lending litigation as it might be in other types of cases because of the limits placed on the award of damages by the Act. As noted before, Truth in Lending cases do not usually result in awards of actual damages because of problems of proof or the purely technical nature of the violation. The statutory damages provided by the Act were limited to $1,000 for individual actions and $100,000 or 1% of the creditor's net worth in class actions. 15 U.S.C. section

1640(a)(2) as amended in 1972.[10] The Act also requires the courts to consider in determining the amount of the award in a class action, among other relevant factors: the amount of actual damages, the frequency and persistency of the creditor's non-compliance, the creditor's resources, the number of persons affected, the extent to which the creditor's non-compliance was intentional. The limits on class damages are to prevent the catastrophic loss that could otherwise occur in class actions with many persons in the class. S.Rep.No.93–278, pp. 14–15. The additional considerations direct the courts to individualize the damages to fit the nature of the violation and the ability of the violator to pay. No limit is placed on the awards of actual damages. The obvious concern in limiting statutory damages is to avoid unduly penalizing a creditor with an assessment of damages which are essentially a windfall to the successful plaintiffs. This concern does not apply to the awards of attorneys' fees for these fees represent actual expenses incurred by the plaintiffs or, in contingency cases such as this, compensation for their attorneys. The award of attorneys' fees is not a windfall to plaintiffs, and their reduction or denial would occasion a real loss to them. There is little reason to look to the limited award of statutory damages to determine the reasonableness of attorneys' fees which are generated by the unlimited costs of litigation.

Plaintiffs did not seek actual damages in this case. Because of the net worth of the defendant, damages were limited to $44,-700.84. Upon examination of the aforementioned additional considerations for the Court to review in assessing damages, the Court further reduced the award to one half of the amount allowed. See Court's November 3, 1977 Memorandum. The attorneys' fees sought by plaintiffs exceeds this award, and the fees that the Court will eventually award will approximate it. Defendant objects that it is an "unreasonable

judicial system which would permit the attorney to get an award larger than the client's." Defendant's contention ignores the purpose for limiting statutory damages and the fact that attorneys' fees do not confer any benefit on the plaintiffs or their attorneys other than to make them whole.

The Court also notes the litigation expenses incurred by the plaintiffs were largely generated in response to defendant's tenacious defense on every procedural and substantive issue in the case, up to and including the present motions. Defendant set the pace in this suit from filing a dispositive motion before the completion of discovery, to resisting discovery, to challenging the award of any damages and attorneys' fees. Defendant certainly has the right to assert all defenses, but it must bear the cost incurred by the necessary responses to it tactics. See Starks v. Orleans Motors, Inc., 372 F.Supp. 928, 933 (E.D.La.), aff'd 500 F.2d 1182 (5th Cir. 1974).

Finally, as the Court noted heretofore, there is precedent for an award of attorneys' fees in Truth in Lending cases exceeding or approximating the award of damages. See note 6, supra.

9. *The experience, reputation, and ability of attorneys.*

Defendant does not challenge the qualifications of plaintiffs' attorneys except in noting the younger attorney's relative inexperience at the commencement of the suit. This factor has been discussed above.

10. *The undesirability of the suit.*

This factor is directed toward cases that may be unpopular in the community. A suit under the Truth in Lending Act is not such a case.

11. *The nature and length of the professional relationship with the client.*

The named plaintiff employed the class plaintiffs' attorney Kass as their counsel for

---

**10.** Section 1640 was amended a second time on March 23, 1976, by Public Law 94–240. That amendment provided that the ceiling for recovery in class actions would be the "lesser of $500,000 or 1 per centum of the net worth of

the creditor." Plaintiffs have asserted that the $500,000 limitation applies to this litigation. But that amendment did not become effective until March 23, 1977. Public Law 94–240, section 6, 90 Stat. 261.

the transaction which gave rise to the basic suit.

### 12. Awards in similar cases.

Courts have made numerous awards of attorneys' fees under the Act. As noted above, awards of attorneys' fees exceeding or approximating the award of damages are not uncommon. Defendant's opposition to the award of fees on this factor is limited to this point which was discussed above and dismissed.

There being no question of the court's statutory authority to make an award of attorneys' fees, the only other relevant consideration under this factor would be the absolute amount of the award. Comparison with other class actions brought under the Truth in Lending Act does not show the award that the Court is making herein to be unduly large. *See, e. g., Barber v. Kimbrell's, Inc.*, 424 F.Supp. 42 (W.D.N.C.1976) ($25,000 awarded for attorneys' fees); *Welmaker v. W. T. Grant Co., supra*, ($17,500 awarded as attorneys' fees even though class was never certified).

The attorneys' fees that the Court will award plaintiffs' counsel are:

| | |
|---|---|
| Mr. Kass: 85¾ hrs. at $75 | $6,431.25 |
| Mr. Skalet: 195.3 hrs. at $60 | 11,718.80 [11] |
| | $18,150.05 |

### III

### Costs

The Clerk of the Court has taxed the defendant for costs of $189.03. Both parties have moved for the Court to review this assessment. Defendant contends that it is premature because the November 3, 1977 Order of this Court, which awarded damages to plaintiffs, is not a final appealable judgment. But the Court's November 3, 1977 Order expressly directed plaintiffs to file their motion for costs with the Clerk within ten days of that Order. Plaintiffs complied with that Order. The Court will deny defendant's motion.

Plaintiffs' motion seeks to augment the costs awarded by the Clerk. Specifically, plaintiffs seek reimbursement for $1,414.20

spent for an expert witness, $180.66 for the costs of depositions, $136.23 for "postage and copying, taxis and out-of-pocket expenses."

Generally, costs for expert witnesses are limited to the statutory fee for witnesses rather than the actual fees charged by the witness, which is what plaintiffs seek by their motion. E. g., *Taylor v. Washington Terminal Co.*, 308 F.Supp. 1152 (D.D.C.1970); *Firtag v. Gendleman*, 152 F.Supp. 226 (D.D.C.1957). *Peck, Taxation of Costs*, 37 F.R.D. 481, 490 (1965). An exception is sometimes made when the proponent of the expert witness has secured the prior approval of the Court. Plaintiffs did not obtain the Court's approval, but they argue that they should still be awarded the actual fees because it was defendant's obstinate resistance to discovery regarding its net worth which required the employment of the expert. There is no question that the defendant would not stipulate to its net worth, an item of information necessary to the determination of the maximum statutory damages the Court could award. 15 U.S.C. section 1640(a)(2). Plaintiffs' expert provided the Court with this information. The federal rules, however, provide less expensive ways to obtain this same information, such as requests for admissions and the service of interrogatories, and plaintiffs' failure to employ these available methods precludes them now from receiving the $1414.20 they seek as expert witness fees.

Plaintiffs' request for an award to cover their counsel's unspecified out-of-pocket expenses must also be denied. Such expenses are not normally taxable as costs. *Blankenship v. Boyle*, 337 F.Supp. 296, 302 (D.D.C.1972). Plaintiffs offer no statutory support for their request other than noting the "mandatory" nature of the award of costs under the Act. Because normally taxable costs are awarded as a matter of course to prevailing litigants under 28 U.S.C. § 1920, plaintiffs contend that the mandatory award of costs under the Act was intended to expand the meaning of

---

11. Mr. Skalet's hours include the ten hours spent on the petition for attorneys' fees.

"costs" to include out-of-pocket expenses. Obviously, other equally logical interpretations can be given to the provision of a mandatory award, and if Congress intended to expand the coverage of costs they could have done so more clearly than as suggested by plaintiffs.

As case law support for their contention, plaintiffs cite *Bradley v. School Board of City of Richmond*, 53 F.R.D. 28 (E.D.Va. 1971), *rev'd* 472 F.2d 318 (4th Cir. 1972), *vacated* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974),[12] for the proposition that an award for disbursements is proper when a litigant functions as a "private attorney general." Plaintiffs note that other courts have expressly found that Congress intended to utilize private plaintiffs under the Act to serve as private attorneys general. *E. g., McGowan v. Credit Center of North Jackson, Inc., supra*; *Sosa v. Fite*, 498 F.2d 114 (5th Cir. 1974); *Ratner v. Chemical Bank New York Trust Co.*, 329 F.Supp. 270 (S.D.N.Y.1971).

*Bradley*, however, was decided prior to *Alyeska, supra*, which stated that:

> [C]ongressional utilization of the private-attorney-general concept can in no sense be construed as a grant of authority to the Judiciary to jettison the traditional rule against nonstatutory allowances to the prevailing party and to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award. 421 U.S. at 263, 95 S.Ct. at 1624.

Moreover, *Bradley* presented a more compelling case than that here for a court to exercise whatever equitable authority it has after *Alyeska* to award attorneys' fees and costs. *Bradley* was a class action brought under 42 U.S.C. § 1983 to end racial discrimination in the operation of public schools in Richmond, Virginia. The case was litigated for sixteen years in the face of what the district judge found to be "ob-

durate obstinacy" on the part of the defendant. Of particular relevance here, the district judge noted that the complexity and unpopularity of the case necessitated the utilization of out-of-town counsel, whose travel expenses accounted for the bulk of the disbursements claimed.

The Court does find some potential merit in plaintiffs' request for the enlargement of the costs awarded for the taking of depositions. Expenses incident to the taking of depositions are taxable as costs if the depositions are reasonably necessary for use in the case, but not if the depositions are necessary only for preparation for the case. Moore's Federal Practice ¶ 54.77[4]. The Court received several of plaintiffs' depositions in an evidentiary hearing on damages and relied on these depositions in determining the propriety and amount of statutory damages. November 3, 1977 Memorandum, p. 5 nn. 4, 6 & 7. It is not apparent from plaintiffs' motion or from the Clerk of Court's Bill of Costs whether plaintiffs were denied compensation for these depositions or for other depositions which were not reasonably necessary for use in this case. The Court will therefore deny this aspect of plaintiffs' motion without prejudice to its refiling within ten days of this Memorandum.

Finally, defendant's motion to revise the November 3, 1977 Order to include Fed.R. Civ.P. 54(b) certification will be denied as moot, because the Order accompanying this Memorandum will direct the Clerk of the Court to enter judgment for the plaintiffs.

### IV

One final matter pending before the Court is the defendant's motion to strike the name of Mr. and Mrs. Keiper from the list of persons in plaintiffs' class and to reduce the damage award proportionately. In support of its motion the de-

---

12. Plaintiffs neglected to cite the subsequent history of *Bradley*. The Court of Appeals found that defendants' actions did not constitute unreasonable, obdurate obstinacy which would authorize an equitable award of attorneys' fees. 472 F.2d 318. The Supreme Court found a statutory basis for the award and thus vacated the reversal and remanded the case for a determination of fees permitted by that statute. 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476.

fendant has filed the Keipers' letter of December 5, 1977, to plaintiffs' counsel which expressed the Keipers' "wish to be excluded from the class in the Postow class action suit against Oriental Building Association." Plaintiffs do not oppose striking the name of the Keipers, but they do oppose any reduction in the award, correctly noting that the Court did not base the award on the individual statutory remedy. Instead, the Court made the award pursuant to the class statutory remedy, and granted only one half the maximum allowable according to the statute and the defendant's net worth. The relatively few plaintiffs in this case had a marginal effect on the Court's award. As the Court expressly noted in its November 3, 1977 Memorandum: "(the) number of persons adversely affected . . (does) not weigh heavily toward exacting a heavy penalty from defendant." It was, however, only one of several factors that the Court considered in awarding less than the full amount of damages authorized. The loss of one set of plaintiffs, therefore, does not demand a further reduction in the award.